UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| MONROE STAFFING SERVICES, LLC and STAFFING 360 SOLUTIONS, INC.,<br><br>                              Plaintiffs,<br><br>         -against-<br><br>PAMELA D. WHITAKER,<br><br>                              Defendant. | Case No. _____ |

# COMPLAINT

Plaintiffs Staffing 360 Solutions, Inc. ("Staffing 360") and Monroe Staffing Services, LLC ("Monroe" and collectively, with Staffing 360, "Plaintiffs"), by and through their attorneys, Haynes and Boone, LLP, for their Complaint against Defendant Pamela D. Whitaker ("Defendant" or "Whitaker" and, collectively with Plaintiffs, the "Parties"), respectfully allege as follows on knowledge as to their own acts and on information and belief as to all other matters except as indicated:

## NATURE OF THE ACTION

1.      This is an action for fraudulent inducement and breach of contract arising from Defendant's various misrepresentations and provision of false information to Plaintiffs in connection with Monroe's purchase (the "Purchase") of all issued and outstanding shares of Defendant's staffing agency, Key Resources, Inc. ("KRI"), in August 2018.

2.      The terms and conditions of Monroe's Purchase were memorialized in a Stock Purchase Agreement ("SPA") and a subsequent amendment agreement (the "Amendment" and, collectively with the SPA, the "Agreement") which, *inter alia*, establishes the Parties' respective obligations and sets forth Defendant's numerous representations and warranties to Plaintiffs.

3. As set forth herein, both prior to and as part of the Agreement, Defendant knowingly made numerous misrepresentations of material facts to Plaintiffs regarding KRI's operations, liabilities and/or finances – all of which sought to induce Plaintiffs to enter into the Agreement and on which Plaintiffs reasonably relied in executing the Agreement with Defendant, or which otherwise became a material element of the deal for which Plaintiffs bargained.

4. Defendant's numerous material misrepresentations necessarily meant that the business Monroe *believed* it was purchasing under the Agreement was *not* the business it ultimately received from Defendant. Rather, KRI was a business operating in dereliction of numerous corporate, financial and/or legal responsibilities and under constant threat of penalties and/or liabilities – all of which render the company far less valuable than the amount paid by Monroe and have further caused or will soon cause Plaintiffs to suffer additional damages.

5. Accordingly, Defendant is liable to Plaintiffs for the full amount of damages suffered, or which will be suffered, by Plaintiffs as a result of Defendant's actions and/or inactions including, but not limited to, Defendant's fraudulent conduct and related breaches of the Agreement, in an amount to be determined at trial but in no event less than $6 million.

## THE PARTIES

6. Plaintiff Monroe is a Delaware limited liability company whose principal place of business is located at 6 Research Drive, Suite 440, Shelton, Connecticut 06484.

7. Plaintiff Staffing 360 is a Delaware corporation and public company whose principal place of business is located at 641 Lexington Avenue, New York, New York 10022.

8. Upon information and belief, Defendant Whitaker is an individual residing in Winston-Salem, North Carolina.

## JURISDICTION AND VENUE

9. This court has jurisdiction over this matter pursuant to 28 U.S.C. § 1332 because the Plaintiffs are completely diverse from the Defendant and the amount in controversy exceeds $75,000. Further, under Section 8.08 of the SPA (the "Forum Selection Clause"), incorporated into the Amendment by Section 3, the Parties expressly and "irrevocably" agreed to submit to the "exclusive jurisdiction" of the state or federal courts of New York located in the city and county of New York with respect to "[a]ny legal suit, action, proceeding, or dispute arising out of or related to [the] Agreement, the other transaction documents, or the transactions contemplated hereby or thereby . . . ." *See* SPA, § 8.08

10. Venue is also proper in this Court pursuant to the Forum Selection Clause and pursuant to 28 U.S.C. §1391(b)(2) because a substantial part of the events giving rise to these claims occurred in this jurisdiction.

## FACTUAL BACKGROUND

*A.    The Business And History Of Monroe.*

11. Monroe began as a small staffing business for design engineers and friends looking for work in Monroe, Connecticut in 1970.

12. Over the last 50 years Monroe has grown into a highly successful staffing agency with 12 branch offices and client on-site work force management programs throughout Connecticut, Massachusetts, Rhode Island, New Hampshire and the Carolinas. While Monroe's operations have developed over time, the core of its business remains to assist companies with their temporary staffing and hiring needs.

13. Aided by the guidance of Monroe's Director of Commercial Staffing, Paul Polito, and motivated by increased client demand for its services in the South, Monroe initiated efforts to expand its operations to the Southeastern United States in or about 2012.

14. Monroe conducted market research, office space searches and engaged in business planning to determine suitable markets for its services. Monroe ultimately concluded that the Carolinas presented a good opportunity for the expansion of its operations. Between 2012 and 2019, Monroe opened four offices in North and South Carolina.

15. On or about January 10, 2010, Monroe was acquired by Initio International ("Initio"), a full-service staffing company based in London.

**B.  *The Business Of Staffing 360.***

16. Staffing 360 is a rapidly growing international staffing company engaged in the acquisition and integration of U.S. and U.K. staffing agencies.

17. Staffing 360 provides staffing solutions to companies in a wide array of industries who require staffing for finance, accounting, administrative, engineering, information technology, and/or other commercial positions.

18. Staffing 360 operates through three business streams: Professional Staffing (U.S.), Commercial Staffing (U.S.), and Professional Staffing (U.K.), and focuses primarily on supporting accounting and finance, information technology, engineering, administration, and commercial disciplines. Through its subsidiaries, Staffing 360 offers temporary contractors and permanent placement services.

19. Specifically, Staffing 360 offers a comprehensive range of recruitment services, ranging from contract/temporary staffing, contingency permanent recruitment, and retained search and selection, to managed services and recruitment process outsourcing.

20. In addition, Staffing 360 offers a broad range of complimentary and value-added services for both candidates and clients, including assessment, testing, training, and coaching for hiring managers, and professional guidance on legal/employment matters.

21. In or about January 2014, Staffing 360 acquired Initio and Monroe.

22. As a result of the acquisition, Monroe became a division and wholly-owned subsidiary of Staffing 360.

C. *Monroe Considers Expanding Its Operations By Acquiring KRI.*

23. In or about the spring of 2018, Staffing 360 and Monroe began to investigate the possibility of further expanding Monroe's operations in North Carolina.

24. In the course of this research, Staffing 360 was approached by the investment firm, Anderson, LeNeave & Co. ("Anderson LeNeave"), which was hired by Defendant to identify potential purchasers for her temporary staffing company, KRI, which Defendant founded in 1997.

25. KRI provides long-term, short-term, and temp-to-hire staffing services as well as corporate payrolling for clients. KRI has offices located throughout an area in the north-central portion of North Carolina known as the Triad, including offices in Graham, Winston-Salem, and Greensboro.

26. KRI advertised itself as being able to meet the staffing needs of clients through its employment of pre-screened employees capable of supplying labor for increased short-term demands, peak season, or temp-to-perm employees. KRI claimed that it had "the expertise to hire the right people while you concentrate on your core business."

27. After being introduced to Defendant by Anderson LeNeave, Plaintiffs began to discuss the potential for Monroe to acquire KRI as part of Monroe's expansion into the North Carolina market.

D. *Defendant's Material Misrepresentations In The Course Of The Parties' Negotiations.*

28. Over the course of several months, the Parties engaged in a series of discussions

5

concerning the potential sale of KRI to Monroe.

29.     As part of these discussions, Defendant provided Plaintiffs with a variety of material information regarding KRI's finances, operations, and workforce.

30.     For example, on May 9, 2018, Defendant and her broker from Anderson, Peter Wright, met with Paul Polito of Monroe and David Faiman and Brendan Flood of Staffing 360 over lunch to discuss KRI's business.  During the lunch, Defendant consistently touted the strength of KRI's operations and financial performance including, but not limited to, its workforce.

31.     On July 18, 2018, Defendant had a telephone conversation with Staffing 360's Chairman and Chief Executive Officer, Brendan Flood, to discuss the Parties' continued negotiations.  During this call, Defendant continued to laud KRI's performance, operations and workforce.

32.     At no time during these negotiations did Plaintiffs have a reason to question the veracity of Defendant's statements.

33.     The factual representations that Defendant made to Plaintiffs' representatives during the course of the Parties' discussions with respect to KRI's workforce of employees, independent contractors, and contingent workers was critical to Plaintiffs' consideration of the opportunity to purchase KRI from Defendant because, as a staffing agency, the primary asset of KRI was – and is – its workforce.

34.     In reliance on the numerous representations of material fact made by Defendant in the course of the Parties' negotiations, as well as the representations of fact that Plaintiffs understood would be expressly set forth in writing as part of the proposed agreement's representations and warranties, Monroe decided to purchase KRI from Defendant for a total

purchase price of $12,163,188 (the "Purchase Price").

**E.     *The Share Purchase Agreement.***

35.     On or about August 27, 2018, the Parties executed the SPA, whereby Whitaker sold 100% of the issued and outstanding shares of KRI to Monroe.  A true and correct copy of the SPA is annexed hereto as **Exhibit A.**

36.     Under the SPA, the parties agreed that, "[s]ubject to the terms and conditions set forth herein, at the Closing . . . Seller shall sell to Buyer, and Buyer shall purchase from Seller" all issued and outstanding shares in KRI.  Ex. A (SPA), § 1.01.

37.     Specifically, Plaintiffs agreed, "[s]ubject to the terms and conditions of [the SPA]," to pay the Purchase Price in three installments as follows:

> **Section 1.03 – Payment of Purchase Price.**  *Subject to the terms and conditions of this Agreement*, the Purchase Price shall be paid as follows:
>
> (a)     on the Closing Date, Buyer shall pay to Seller the amount of $8,108,794 (the "Closing Date Payment");
>
> (b)     on the first anniversary of the Closing Date, Buyer shall pay to Seller an amount $2,027,198, subject to adjustment as set forth in subsection 1.04 below (the "First Year Earnout"); and
>
> (c)     on the second anniversary of the Closing Date, Buyer shall pay to Seller an amount $2,027,198, subject to adjustment as set forth in subsection 1.04 below (the "Second Year Earnout" and, together with the First Year Earnout, the "Earnout Payments").

Ex. A (SPA), § 1.03. (emphasis added.)

38.     In agreeing to the Purchase Price, Plaintiffs placed value on KRI's alleged intrinsic qualities – as represented by Defendant – including, but not limited to, its key personnel, workforce and financial performance.

39.     Staffing 360 signed onto the SPA "solely with respect to the specific provisions set forth on the signature page" which included certain of the payment obligations, and

guaranteed the full and timely performance of Monroe's payment obligations under the SPA. Ex. A (SPA) at 1, § 1.05.

40. However, the SPA expressly provided that Staffing 360 "shall be entitled to assert any and all rights, remedies and defenses which would otherwise be available to [Monroe] under this Agreement." *Id.*, § 1.05(b).

**F.   *Defendant's Numerous Representations And Warranties To Plaintiffs Under the SPA.***

41. Under Article III of the SPA ("Article III"), Defendant provided numerous representations and warranties to Plaintiffs.

42. Defendant's representations and warranties to Plaintiffs under Article III of the SPA constitute statements of present fact.

43. Indeed, Defendant expressly represented and warranted to Plaintiffs that each of the statements contained in Article III were "true and correct" as of the date of the SPA. *See* Ex. A (SPA), Article III at p. 7.)

44. Further, pursuant to Section 3.22 of the SPA, Defendant expressly represented and warranted that she had provided Plaintiffs with "full disclosure" and that no representation or warranty set forth under the SPA, and no statement contained in the SPA's Disclosure Schedules or any certificate or other document furnished or to be furnished to Monroe pursuant to the SPA, contained any untrue statement of material fact or omitted to state a material fact necessary to make statements contained in the SPA not misleading as follows:

> **Section 3.22 Full Disclosure.**  No representation or warranty by Seller in this Agreement and no statement contained in the Disclosure Schedules to this Agreement or any certificate or other document furnished or to be furnished to Buyer pursuant to this Agreement contains any untrue statement of material fact, or omits to state a material fact necessary to make the statements contained therein, in light of the circumstances in which they are made, not misleading.

Ex. A (SPA), § 3.22.

45.   The representations set forth under the SPA including, but not limited to, Article III, were vital to Plaintiffs' decision to execute the Agreement because numerous material facts that were critical to Monroe's decision to purchase KRI were peculiarly within the knowledge of Defendant and not disclosed to Plaintiffs.

46.   Further, the representations and warranties set forth under Article III of the SPA represent contractual stipulations that the facts covered by such representations and warranties constitute information exclusively within Defendant's knowledge.

47.   Accordingly, the representations and warranties set forth under Article III of the SPA including, but certainly not limited to, the specific representations of "Full Disclosure" made under Section 3.22, imposed a duty on Defendant to provide accurate and adequate facts on which Plaintiffs were entitled to rely.

48.   Among the numerous representations and warranties that Defendant made to Plaintiffs under Article III of the SPA, was a representation that KRI had the full corporate power and authority to operate and carry on its business in the manner in which it was being conducted at the time of the SPA as follows:

> **Section 3.02   Organization, Authority, and Qualification of the Company.**  The Company is a corporation duly organized, validly existing, and in good standing under the Laws of the state of North Carolina, has been a validly electing and qualifying S-corporation within the meaning of Section 1361 and Section 1362 of the Code since January 1, 2004 and shall continue to be a valid S-corporation for federal, state and local Tax purposes up to and including the Closing Date, and has full corporate power and authority to own, operate, or lease the properties and assets now owned, operated, or leased by it and to carry on its business as it has been and is currently conducted.

Ex. A (SPA), § 3.02.

50.   Defendant further represented and warranted that KRI had "no liabilities,

9

obligations, or commitments of any nature whatsoever, whether asserted, known, absolute, accrued, matured, or otherwise" as follows:

> **Section 3.07  Undisclosed Liabilities.** The Company has no liabilities, obligations, or commitments of any nature whatsoever, whether asserted, known, absolute, accrued, matured, or otherwise (collectively, "Liabilities"), except: (a) those which are adequately reflected or reserved against in the Balance Sheet as of the Balance Sheet Date; and (b) those which have been incurred in the ordinary course of business consistent with past practice since the Balance Sheet Date and which are not, individually or in the aggregate, material in amount.

Ex. A (SPA), § 3.07.

51. Defendant also represented that no events had occurred following her provision of KRI's balance sheet to Plaintiffs which could adversely impact KRI's business as follows:

> **Section 3.08  Absence of Certain Changes, Events, and Conditions.** Since the Balance Sheet Date, and other than in the ordinary course of business consistent with past practice, there has not been, with respect to the Company, any change, event, condition, or development that is, or could reasonably be expected to be, individually or in the aggregate, materially adverse to the business, results of operations, condition (financial or otherwise), prospects, or assets of the Company.

Ex A (SPA), § 3.08.

52. Defendant further represented that no events had occurred and no circumstances existed that might give rise to, or serve as the basis for, *inter alia*, any actions, claims, inquiries, audits, notices of violations, or investigations of any kind as follows:

> **Section 3.14  Legal Proceedings; Governmental Orders.**
>
> (a)  There are no claims, actions, causes of action, demands, lawsuits, arbitrations, inquiries, audits, notices of violation, proceedings, litigation, citations, summons, subpoenas, or investigations of any nature, whether at law or in equity (collectively, "Actions") pending or, to Seller's knowledge, threatened against or by the Company, Seller, or any Affiliate of Seller: (i) relating to or affecting the Company or any of the Company's properties or assets; or (ii) that challenge or seek to

>prevent, enjoin, or otherwise delay the transactions contemplated by this Agreement. To Seller's knowledge, no event has occurred or circumstances exist that may give rise to, or serve as a basis for, any such Action.

Ex. A (SPA), § 3.14(a).

53. Defendant also represented that KRI had complied, and was complying, with all laws applicable to its business as follows:

>**Section 3.15   Compliance With Laws; Permits.**
>
>(a)   The Company has complied, and is now complying, with all Laws applicable to it or its business, properties, or assets.
>
>(b)   All Permits in order for the Company to conduct its business, including, without limitation, owning or operating any of the Real Property, have been obtained and are valid and in full force and effect. Section 3.15(b) of the Disclosure Schedules list all current Permits issued to the Company and no event has occurred that would reasonably be expected to result in the revocation or lapse of any such Permit.

Ex. A (SPA), § 3.15.

54. Importantly, pursuant to Section 3.18(c) of the SPA ("Section 3.18(c)"), Defendant expressly represented and warranted that KRI was in compliance with all laws relating to the employment of its employees, independent contractors and contingent workers as follows:

>**Section 3.18   Employment Matters.**
>
>(c) The Company is and has been in compliance with: (i) all applicable employment Laws and agreements regarding hiring, employment, termination of employment, plant closings and mass layoffs, employment discrimination, harassment, retaliation, and reasonable accommodation, leaves of absence, terms and conditions of employment, wages and hours of work, employee classification, employee health and safety, engagement and classification of independent contractors, payroll taxes, and immigration with respect to all employees, independent contractors, and contingent workers; and (ii) all applicable Laws relating to the relations between it and any labor organization,

> trade union, work council, or other body representing employees of the Company.

Ex. A, § 3.18(c).

55. The representation and warranty set forth under Section 3.18(c) was of critical importance to Plaintiffs in deciding whether or not to execute the SPA and consummate the Purchase of KRI since KRI's primary asset was its workforce upon which KRI's success as a business (or lack thereof) depended.

56. Defendant also represented that KRI had complied with all tax laws relevant to its business as follows:

> **Section 3.19   Taxes.**
>
> (a)   All returns, declarations, reports, information returns and statements, and other documents relating to Taxes (including amended returns and claims for refund) (collectively, "Tax Returns") required to be filed by the Company on or before the Closing Date have been timely filed. Such Tax Returns are true, correct, and complete in all respects. All Taxes due and owing by the Company (whether or not shown on any Tax Return) have been timely paid. No extensions or waivers of statutes of limitations have been given or requested with respect to any Taxes of the Company. Seller has delivered to Buyer copies of all Tax Returns and examination reports of the Company and statements of deficiencies assessed against, or agreed to by, the Company, for all Tax periods ending after December 31, 2014. The term "Tax" or "Taxes" means (i) all federal, state, local, foreign, and other income, gross receipts, sales, use, production, ad valorem, transfer, franchise, registration, profits, license, lease, service, service use, withholding, payroll, employment, unemployment, estimated, excise, severance, environmental, stamp, occupation, premium, property (real or personal), real property gains, windfall profits, customs, duties, or other taxes, fees, assessments, or charges of any kind whatsoever; (ii) any interest, penalties, fines, additions to tax or additional amounts imposed by any Tax authority in connection with any item described in clause (i); and (iii) any Liability in respect of any items described in clauses (i) and/or (ii) payable by reason of contract, assumption, transferee liability, operation of law, Treasury Regulation Section 1.1502-6(a) (or any predecessor or successor thereof or any analogous or similar provision of Law) or otherwise.

     \*        \*        \*

> (e) The Company has complied in all material respects with all applicable Laws relating to the payment and withholding of Taxes and has duly and timely withheld and paid over to the appropriate Tax authority all amounts required to be so withheld and paid under all applicable Laws.

Ex. A (SPA), § 3.19(a), (e).

  57. Finally, Defendant represented that the books and records of KRI were complete and accurate as follows:

> **Section 3.20  Books and Records.** The minute books and share record and transfer books of the Company, all of which are in the possession of the Company and have been made available to Buyer, are complete and correct.

Ex. A (SPA), § 3.20.

  58. Among other things, Plaintiffs believed they were purchasing Defendant's promise regarding the truth of the warranted and represented facts set forth under the Agreement including, but not limited to, those identified and set forth at length herein.

**G.** ***Unbeknownst to Plaintiffs, Defendant's Representations Were False.***

  59. Unbeknownst to Plaintiffs, at the time that Defendant made each of the foregoing representations she knowingly misrepresented the material facts stated and/or omitted material facts underlying those representations with the intention of inducing Plaintiffs' reliance to enter the Agreement.

  60. Among other things, Defendant knowingly misrepresented that KRI was operating in compliance with all laws, rules and regulations governing the employment and/or retention of its workforce and that KRI was authorized to operate and carry on its business in the manner in which it was being conducted as of the date the SPA was executed.

  61. Upon information and belief, Defendant's misrepresentations included but are not

limited to her knowing misrepresentations of the present facts denoted by the representations and warranties set forth by Sections 3.02, 3.07, 3.08, 3.14, 3.15, 3.18, 3.19, 3.20 and 3.22 of the SPA in so far each of the representations set forth in those Sections state that KRI was in compliance with various rules, regulations and laws governing numerous aspects of KRI's employment and/or retention of its workforce when, in fact, Defendant knew that was *not* the case.

62.     As the result of Defendant's various misrepresentations – individually and collectively – Defendant led Monroe to believe that the business it was purchasing under the Agreement was far more valuable than the business Monroe received.

63.     In actuality, the business Monroe received from Defendant as a result of the Purchase was decidedly inferior to the business Defendant advised Plaintiffs she was selling to Monroe.

64.     Plaintiffs justifiably relied on Defendant's numerous misrepresentations – including, but not limited to, the numerous misstatements and omissions of present facts set forth in Article III of the SPA – and executed the SPA, and Monroe promptly tendered the Closing Date Payment in the amount of $8,108,794 to Defendant.[1]

**G.     *The Amendment.***

65.     On September 11, 2019, the Parties executed the Amendment pursuant to which, among other things, the deadline by which the First and Second Year Earn-out Payments needed to be paid in full was extended to and including February 27, 2020.  A true and correct copy of the Amendment is annexed hereto as **Exhibit B**.

66.     In accordance with the Amendment's terms, Monroe tendered interest on the First Year Earnout to Defendant in the amount of $10,000 per month – representing the agreed upon interest rate on the First Year Earnout – for the months of September 2019, October 2019,

---

[1] Defined terms not defined herein should be given the meaning set forth under the Agreement.

November 2019, December 2019 and January 2020.

67. The Amendment includes a governing law and jurisdiction clause which makes clear that the "Governing Law; Submission to Jurisdiction" clause set forth under Section 8.08 of the SPA was "incorporated herein by reference and made a part hereof." Ex. B (Amendment), § 3.

68. The Amendment further provides that "[e]xcept as set forth herein, the Share Purchase Agreement shall remain in full force and effect." *Id*. § 4.

### H.   *Plaintiffs Discover Indications Of Defendant's Fraud.*

69. In or about November 2019, only months after Plaintiffs' agreement to the terms of the Amendment, Plaintiffs discovered that certain of the representations that Defendant made to them in connection with the Purchase and upon which Plaintiffs reasonably relied in executing the SPA and the Amendment may have been false.

70. Specifically, members of Staffing 360's senior management discovered that KRI's hiring and retention practices appeared to have violated various rules, laws and regulations.

71. In many instances KRI's hiring practices under Defendant's leadership were so suspect as to call into question the ability of KRI's employees, independent contractors, and contingent workers to continue their employment with Plaintiffs.

72. Based upon these findings, Plaintiffs' counsel wrote to Defendant on November 25, 2019 (the "Notice"), to put Defendant on notice that Plaintiffs had discovered that certain of the representations made to them in connection with the Purchase appeared to be false and that Plaintiffs were initiating an investigation into Defendant's potential fraud.

73. While Plaintiffs were hopeful that their investigation would conclude without any

findings of malfeasance, Plaintiffs reserved all rights to take any and all action necessary to preserve and/or assert their rights.

### I.     *Plaintiffs' Suspicions – And Defendant's Fraud – Are Confirmed.*

74.     Based on their suspicions, Plaintiffs conducted a review of KRI's hiring and retention practices and related documentation and files.

75.     By late February 2020, it became clear that large percentages of the employment records provided and/or maintained by Defendant with respect to KRI's workforce and provided to Plaintiffs in connection with the Purchase were either missing or appeared suspicious.

76.     Specifically, Plaintiffs' review revealed that, contrary to Defendant's representations, KRI's hiring practices violated various rules, laws and regulation governing KRI's operations and/or employment of certain individuals and that a large percentage of KRI's employees, independent contractors and contingent workers may not be able to continue their employment with the company.

77.     This discovery confirmed that the workforce which Defendant promised Plaintiffs that Monroe would receive as a result of the Purchase – KRI's primary asset – was not the workforce Monroe actually received.

78.     Rather, the workforce that Monroe actually received and was able to utilize as a result of the Purchase was far smaller than the one Defendant led Monroe to believe it was purchasing when the Parties executed the SPA.

79.     This discovery also meant that many of the warranties and representations set forth in the SPA included misstatements of present material facts and/or omitted material facts. For example, contrary to the representation set forth in Section 3.02 of the SPA, upon information and belief, KRI did *not* have the authority to operate and carry on its business as it

was being conducted both prior to and at the time of the Parties' execution of the SPA.

80. Similarly, upon information and belief, Defendant also knowingly misrepresented the statements of fact included as part of the representations set forth under Sections 3.07 and 3.08 of the SPA because, contrary to Defendant's representations, there were: (i) liabilities and/or conditions that were not adequately reflected in the Balance Sheet provided to Plaintiffs; and/or (ii) certain events, conditions, or developments that could reasonably be expected to be materially adverse to the business, results of operations, condition (financial or otherwise), prospects or assets of KRI following Defendant's provision of KRI's Balance Sheet to Plaintiffs.

81. The discovery of the improprieties with respect to KRI's employment records and/or documentation also confirmed that the statements of fact made by Defendant under Sections 3.14 and 3.15 were false because, upon information and belief, *inter alia*: (i) under Defendant's leadership KRI had not and was not complying with all laws applicable to it or its business, properties, or assets; and/or (ii) Defendant was aware that circumstances existed that might give rise to, or serve as a basis for claims, actions, causes of action, demands, lawsuits, arbitrations, inquiries, audits, notices of violation, proceedings, litigation, citations, summons, subpoenas, or investigations of any nature against KRI, Defendant or any affiliate of Defendant.

82. The improprieties discovered with respect to KRI's hiring practices and related records and/or documentation also meant that Defendant's representations under Section 3.18 were knowingly false because, upon information and belief, KRI was not, and had not been, in compliance with, *inter alia*, all applicable employment regulations and/or laws with respect to its employees, independent contractors, and contingent workers.

83. Upon information and belief, Defendant's representations under Section 3.19 of the SPA were also knowingly false because, upon information and belief, the improprieties

affecting Defendant's employment documentation may have certain tax implications.

84. Importantly – and perhaps most alarmingly – Plaintiffs' investigation, including interviews with many of Defendant's former employees at KRI, revealed that Defendant was well-aware of the issues surrounding the documentation of KRI's workforce both prior to and at the time she executed the SPA and the Amendment with Plaintiffs.

85. Indeed, according to employees at KRI, Defendant encouraged the misconduct.

**J.  *Plaintiffs Notify Defendant Of Her Material Breaches Of The Agreement, Failure To Substantially Perform, And Fraudulent Conduct Necessitating This Action.***

86. On February 26, 2020, Plaintiffs wrote to Defendant advising her that the suspicions set forth in Plaintiffs' November 25 Notice were confirmed and that they were electing to exercise their rights to terminate the Agreement and sue for breach of the Agreement and fraudulent inducement (the "February 26 Letter").

## FIRST CAUSE OF ACTION
**(Fraudulent Inducement)**

87. Plaintiffs repeat and reallege the allegations contained in paragraphs 1 through 86 of this Complaint as if fully set forth herein.

88. As described above, Defendant knowingly misrepresented material facts to Plaintiffs in connection with the Agreement.

89. Defendant's misrepresentations were made with the intent to induce Plaintiffs' reliance to, among other things, cause Plaintiffs to execute the Agreement and consummate Monroe's purchase of KRI.

90. Plaintiffs reasonably relied on Defendant's misrepresentations of material facts in choosing to execute the Agreement and, specifically, in agreeing to the purchase price and related payment obligations set forth under the Agreement.

91. As a result of, and in reasonable reliance on, Defendant's numerous material misrepresentations of present fact, Plaintiffs were damaged by agreeing to purchase KRI for a price that is greatly exceeded its true value.

92. Accordingly, Plaintiffs have been damaged in an amount represented by the difference between the purchase price agreed to under the Agreement and the true value of KRI at the time of the Purchase which damage amount is to be determined at trial, but believed to be no less than $6 million plus interest from the date of the misstatements, reasonable attorneys' fees, costs and expenses.

## SECOND CAUSE OF ACTION
**(Breach of Contract)**

93. Plaintiffs repeat and reallege the allegations contained in paragraphs 1 through 92 of this Complaint as if fully set forth herein.

94. As described above, the Agreement constitutes a valid and legally binding contract between Plaintiffs and Defendant.

95. Plaintiffs fully performed their obligations under the Agreement through February 26, 2020.

96. Despite Plaintiffs' performance, Defendant materially breached her obligations under the Agreement by, among other things, breaching numerous representations and warranties set forth under Article III of the SPA as detailed herein.

97. The effect of Defendant's breaches was material.

98. Accordingly, Defendant failed to substantially perform her obligations under the Agreement.

99. As a result of Whitaker's various material breaches of the Agreement and failure to substantially perform her obligations under the Agreement, Plaintiffs have been damaged in an

amount to be determined at trial, but believed to be no less than $6 million, plus interest from the date of breach.

**WHEREFORE**, Plaintiffs demand that judgment be entered in their favor against Defendant as follows:

(i) awarding Plaintiffs damages in an amount to be determined at trial but believed to be no less than $6 million, plus an award of interest;

(ii) awarding Plaintiffs punitive damages in an amount to be determined at trial to the extent permitted by law;

(iii) awarding Plaintiffs the costs, fees and expenses incurred in this action, including without limitation, reasonable attorneys' fees to the extent permitted by law; and

(iv) awarding Plaintiffs such other and further relief as the Court may deem just and proper.

Dated:   February 26, 2020

HAYNES AND BOONE, LLP
*Attorneys for Plaintiffs*

By: /s/ Jonathan D. Pressment
　　Jonathan D. Pressment
　　Abbey Gauger
　　30 Rockefeller Plaza
　　26th Floor
　　New York, New York 10112
　　Telephone: (212) 659-7300
　　Facsimile: (212) 918-8989
　　Jonathan.Pressment@haynesboone.com