UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

MONROE STAFFING SERVICES, LLC and
STAFFING 360 SOLUTIONS, INC.,

Plaintiffs,

-against-

PAMELA D. WHITAKER,

Defendant.

Case No. 1:20-cv-01716 (GBD)

## AMENDED COMPLAINT

Plaintiffs Staffing 360 Solutions, Inc. ("Staffing 360") and Monroe Staffing Services, LLC ("Monroe" and collectively, with Staffing 360, "Plaintiffs"), by and through their attorneys, Haynes and Boone, LLP, for their First Amended Complaint (the "Amended Complaint") against Defendant Pamela D. Whitaker ("Defendant" or "Whitaker" and, collectively with Plaintiffs, the "Parties"), respectfully allege as follows on knowledge as to their own acts and on information and belief as to all other matters except as indicated:

## NATURE OF THE ACTION

1.      This is an action for breach of contract arising from Defendant's breach of various representations and warranties provided to Plaintiffs in connection with Plaintiff Monroe's purchase (the "Purchase") of all issued and outstanding shares of Defendant's staffing agency, Key Resources, Inc. ("KRI"), in August 2018.

2.      The terms and conditions of Monroe's Purchase were memorialized in a Stock Purchase Agreement ("SPA") and a subsequent amendment agreement (the "Amendment" and, collectively with the SPA, the "Agreement") which, *inter alia*, establishes the Parties' respective obligations and sets forth Defendant's numerous representations and warranties to Plaintiffs.

3.      As set forth herein, both prior to and as part of the SPA, Defendant knowingly made numerous misrepresentations of material facts to Plaintiffs regarding KRI's operations, liabilities and/or finances – all of which sought to induce Plaintiffs to enter into the SPA and on which Plaintiffs reasonably relied in executing the SPA with Defendant, or which otherwise became a material element of the deal for which Plaintiffs bargained through their inclusion as specific Representations and Warranties set forth under Article III of the SPA.

4.      Defendant's numerous material misrepresentations necessarily meant that the business Monroe *believed* it was purchasing under the Agreement was *not* the business it ultimately received from Defendant.  Rather, KRI was a business operating in dereliction of numerous corporate, financial and/or legal responsibilities and under constant threat of penalties and/or liabilities – all of which render the company far less valuable than the amount paid by Monroe and have further caused or will soon cause Plaintiffs to suffer additional damages.

5.      Accordingly, Defendant is liable to Plaintiffs for the full amount of damages suffered, or which will be suffered, by Plaintiffs as a result of Defendant's actions and/or inactions including, but not limited to, Defendant's breaches of the Agreement, in an amount to be determined at trial but in no event less than $6 million.

## **THE PARTIES**

6.      Plaintiff Monroe is a Delaware limited liability company whose principal place of business is located at 6 Research Drive, Suite 440, Shelton, Connecticut 06484.

7.      Plaintiff Staffing 360 is a Delaware corporation and public company whose principal place of business is located at 641 Lexington Avenue, New York, New York 10022.

8.      Upon information and belief, Defendant Whitaker is an individual residing in Winston-Salem, North Carolina.

## JURISDICTION AND VENUE

9.    This court has jurisdiction over this matter pursuant to 28 U.S.C. § 1332 because the Plaintiffs are completely diverse from the Defendant and the amount in controversy exceeds $75,000.  Further, under Section 8.08 of the SPA (the "Forum Selection Clause"), incorporated into the Amendment by Section 3, the Parties expressly and "irrevocably" agreed to submit to the "exclusive jurisdiction" of the state or federal courts of New York located in the city and county of New York with respect to "[a]ny legal suit, action, proceeding, or dispute arising out of or related to [the] Agreement, the other transaction documents, or the transactions contemplated hereby or thereby . . . ." *See* Ex. A (SPA), § 8.08

10.    Venue is also proper in this Court pursuant to the Forum Selection Clause and pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events giving rise to these claims occurred in this jurisdiction.

## FACTUAL BACKGROUND

*A.    The Business And History Of Monroe.*

11.    Monroe began as a small staffing business for design engineers and friends looking for work in Monroe, Connecticut in 1970.

12.    Over the last 50 years Monroe has grown into a highly successful staffing agency with 12 branch offices and client on-site work force management programs throughout Connecticut, Massachusetts, Rhode Island, New Hampshire and the Carolinas. While Monroe's operations have developed over time, the core of its business remains to assist companies with their temporary staffing and hiring needs.

13.    Aided by the guidance of Monroe's Director of Commercial Staffing, Paul Polito, and motivated by increased client demand for its services in the South, Monroe initiated efforts

to expand its operations to the Southeastern United States in or about 2012.

14.     Monroe conducted market research, office space searches and engaged in business planning to determine suitable markets for its services.  Monroe ultimately concluded that the Carolinas presented a good opportunity for the expansion of its operations.  Between 2012 and 2019, Monroe opened four offices in North and South Carolina.

15.     On or about January 10, 2010, Monroe was acquired by Initio International ("Initio"), a full-service staffing company based in London.

**B.     *The Business Of Staffing 360.***

16.     Staffing 360 is a rapidly growing international staffing company engaged in the acquisition and integration of U.S. and U.K. staffing agencies.

17.     Staffing 360 provides staffing solutions to companies in a wide array of industries who require staffing for finance, accounting, administrative, engineering, information technology, and/or other commercial positions.

18.     Staffing 360 operates through three business streams: Professional Staffing (U.S.), Commercial Staffing (U.S.), and Professional Staffing (U.K.), and focuses primarily on supporting accounting and finance, information technology, engineering, administration, and commercial disciplines.  Through its subsidiaries, Staffing 360 offers temporary contractors and permanent placement services.

19.     Specifically, Staffing 360 offers a comprehensive range of recruitment services, ranging from contract/temporary staffing, contingency permanent recruitment, and retained search and selection, to managed services and recruitment process outsourcing.

20.     In addition, Staffing 360 offers a broad range of complimentary and value-added services for both candidates and clients, including assessment, testing, training, and coaching for

hiring managers, and professional guidance on legal/employment matters.

21.     In or about January 2014, Staffing 360 acquired Initio and Monroe.

22.     As a result of the acquisition, Monroe became a division and wholly-owned subsidiary of Staffing 360.

**C.     *Monroe Considers Expanding Its Operations By Acquiring KRI.***

23.     In or about the spring of 2018, Staffing 360 and Monroe began to investigate the possibility of further expanding Monroe's operations in North Carolina.

24.     In the course of this research, Staffing 360 was approached by the investment firm, Anderson, LeNeave & Co. ("Anderson LeNeave"), which was hired by Defendant to identify potential purchasers for her temporary staffing company, KRI, which Defendant founded in 1997.

25.     KRI provides long-term, short-term, and temp-to-hire staffing services as well as corporate payrolling for clients.  KRI has offices located throughout an area in the north-central portion of North Carolina known as the Triad, including offices in Graham, Winston-Salem, and Greensboro.

26.     KRI advertised itself as being able to meet the staffing needs of clients through its employment of pre-screened employees capable of supplying labor for increased short-term demands, peak season, or temp-to-perm employees.  KRI claimed that it had "the expertise to hire the right people while you concentrate on your core business."

27.     After being introduced to Defendant by Anderson LeNeave, Plaintiffs began to discuss the potential for Monroe to acquire KRI as part of Monroe's expansion into the North Carolina market.

**D.      *Defendant's Material Misrepresentations In The Course Of The Parties' Negotiations.***

28.      Over the course of several months, the Parties engaged in a series of discussions concerning the potential sale of KRI to Monroe.

29.      As part of these discussions, Defendant provided Plaintiffs with a variety of material information regarding KRI's finances, operations, and workforce.

30.      The materials provided to Plaintiffs included a Confidential Information Memorandum (the "Information Memorandum") prepared for Defendant by her advisors at Anderson LeNeave which provided information regarding KRI's operations for use by Plaintiffs in their consideration of whether to purchase KRI from Defendant.

31.      Among other claims made in KRI's Information Memorandum, were claims that KRI serves "an outsourced value added Human Resources function" and "can provide an expertise to its clients"—specifically with respect to "I-9 Compliance[.]"

32.      I-9 Compliance refers to the proper completion of Form I-9s which are used to verify the identity and employment authorization of individuals hired for employment in the United States. All U.S. employers must properly complete Form I-9 for each individual they hire for employment in the United States. This includes citizens and noncitizens.  Both employees and employers (or authorized representatives of the employer) must complete and sign the Form I-9.

33.      Specifically, on the Form I-9, an employee must attest to his or her employment authorization by representing—under penalty of perjury—that the employee is either: (i) a citizen of the United States, (ii) a noncitizen national of the United States, (iii) a lawful permanent resident, or (iv) an alien authorized to work.  Lawful permanent residents must also provide their alien registration number / USCIS number and aliens authorized to work must provide the end date of their work authorization, as well as their alien registration number /

USCIS number, a Form I-9 admission number or a foreign passport number.

34.     The employee must also present his or her employer with acceptable documents evidencing identity and employment authorization. The employer must examine the employment eligibility and identity document(s) an employee presents to determine whether the document(s) reasonably appear to be genuine and relate to the employee and record the document information on the Form I-9.

35.     The Information Memorandum specifically claimed that KRI "[r]ecruits, screens, interview[s] and places *qualified* workers" (emphasis added) which refers to the Information Memorandum's claim that KRI provided "expertise to its clients" in "I-9 Compliance[.]"

36.     Further, on May 9, 2018, Defendant and her broker from Anderson LeNeave, Peter Wright, met with Paul Polito of Monroe and David Faiman, Brendan Flood, and Chris Lutzo of Staffing 360 over lunch at Ruth's Chris Steakhouse in Charlotte, North Carolina, to discuss KRI's business.

37.     During the lunch, the attendees engaged in a detailed discussion of KRI and its business.  Defendant expressed great pride for the company she built, and consistently touted the strength of KRI's operations and financial performance including, but not limited to, its workforce.

38.     Specifically, with respect to KRI, Defendant assured Plaintiffs that "[w]e have very tight controls over all of our administrative activities" and "[w]e are a values-based organization and uphold the highest standards."

39.     Furthermore, Defendant personally emphasized KRI's compliance with all laws applicable to the business, stating "[w]e have never had any legal issues in relation to our temporary workers."

40.     On July 18, 2018, Defendant had a telephone conversation with Staffing 360's Chairman and Chief Executive Officer, Brendan Flood, to discuss the Parties' continued negotiations.  During the call, Defendant reiterated the statements she made during the May 9, 2018 lunch meeting—namely, that KRI "has no legal issues in relation to our temporary workers[,]" "uphold[s] the highest standards" and "has tight controls over all of our administrative activities[.]"  Thus, Defendant continued to laud KRI's performance, operations and workforce.

41.     At no time during these negotiations did Plaintiffs have a reason to question the veracity of Defendant's oral or written statements.

42.     The factual representations that Defendant made to Plaintiffs' representatives during the course of the Parties' discussions with respect to KRI's compliance with all laws applicable to the business, as well as KRI's workforce of employees, independent contractors, and contingent workers—and the purported legality thereof—were critical and material to Plaintiffs' consideration of the opportunity to purchase KRI from Defendant because, as a staffing agency, the primary asset of KRI was—and is—its workforce.

43.     Indeed, any "reasonable man" purchasing a staffing agency would attach importance to representations regarding the staffing agency's compliance with federal and state employment laws and its workforce's ability to lawfully work in the United States.

44.     Furthermore, Defendant knew that her representations with respect to KRI's workforce of employees, independent contractors, and contingent workers—and the purported legality thereof—were critical to Plaintiffs' consideration of the opportunity to purchase KRI, as well as to Plaintiffs' consideration of the appropriate price for the purchase.  Defendant was therefore motivated to paint her business and its operations in the most positive light—however

false the information she provided to Plaintiffs might be—because she strongly desired to sell KRI.

45.    However, unbeknownst to Plaintiffs at the time of the Parties' negotiations, Defendant's representations to Plaintiffs regarding KRI's operations and workforce were knowingly false when made.  For example, Defendant's representation in the Information Memorandum that KRI "[r]ecruits, screens, interview[s] and places qualified workers" was demonstrably false because, as Plaintiffs later discovered, the identification documents provided by 386 employees (roughly 20% of KRI's workforce) appeared to be inauthentic based on findings that, *inter alia*: (1) the versions of the permanent resident cards submitted with certain Form I-9s did not match-up with the employee's alleged date of residency; (2) the ID documentation provided for certain employees indicated that the ID was issued after 2003 by INS, which could not be possible, because INS ceased to exist in 2003; and/or (3) the ID documentation provided by certain employees contained red flags for forgery, for example, by containing typographical errors or by not containing well-known security design features, such as laser engraved text or government emblems and designs.

46.    In addition, in violation of both North Carolina and federal requirements, Defendant failed to confirm the eligibility of each of its employees to work in the United States through E-Verify, the federal government's online employment status verification system. Instead, Defendant only selectively used E-Verify for certain employees, and failed to create E-Verify cases for more than 400 employees.  Moreover, Defendant wrongfully continued to employ employees *after* E-Verify indicated it could not confirm the employee's employment eligibility.

47.    Similarly, Defendant's representations in the course of the May 9, 2018 lunch meeting and in the course of Defendant's July 18, 2018 telephone call with Staffing 360's

Chairman and Chief Executive Officer, Brendan Flood, that KRI has "very tight controls over all of our administrative activities" and is "a values-based organization and uphold[s] the highest standards" were also knowingly false because, upon information and belief, at the time she made such representations, Defendant was well-aware that KRI failed to ensure that Form I-9s were properly completed for each of its employees and contractors as required by Federal Law. Specifically, the Form I-9s for at least 1,264 employees (which constitutes approximately 64% of KRI's workforce) were not compliant with Immigration Reform and Control Act of 1986 (the "IRCA") requirements, exposing KRI to civil penalties for each deficient Form I-9.

48.     Thus, at the time Defendant made each of the representations regarding the purported strengths of KRI's operations and workforce to Plaintiffs including, but not limited to, those set forth in Paragraphs 31, 35 and 38-40, above, Defendant was actually well-aware that KRI was operating in violation of federal and state law.

49.     However, Defendant knew that, if Monroe became aware that KRI was operating in violation of state and federal law, as well as federal administrative guidance, Monroe would not agree to purchase KRI.

50.     Indeed, the numerous misrepresentations of material fact made by Defendant in the course of the Parties' negotiations, as well as the representations of fact that Plaintiffs understood would be expressly set forth in writing as part of the proposed purchase agreement's representations and warranties, led Monroe to purchase KRI from Defendant for a total purchase price of $12,163,188 (the "Purchase Price").

### E.     The Share Purchase Agreement.

51.     On or about August 27, 2018, the Parties executed the SPA, whereby Whitaker sold 100% of the issued and outstanding shares of KRI to Monroe.  A true and correct copy of

the SPA is annexed hereto as **Exhibit A.**

52.     Under the SPA, the parties agreed that, "[s]ubject to the terms and conditions set forth herein, at the Closing . . . Seller shall sell to Buyer, and Buyer shall purchase from Seller" all issued and outstanding shares in KRI.  Ex. A (SPA), § 1.01.

53.     Specifically, Plaintiffs agreed, "[s]ubject to the terms and conditions of [the SPA]," to pay the Purchase Price in three installments as follows:

> **Section 1.03 – Payment of Purchase Price.**  *Subject to the terms and conditions of this Agreement*, the Purchase Price shall be paid as follows:
>
> (a)     on the Closing Date, Buyer shall pay to Seller the amount of $8,108,794 (the "Closing Date Payment");
>
> (b)     on the first anniversary of the Closing Date, Buyer shall pay to Seller an amount $2,027,198, subject to adjustment as set forth in subsection 1.04 below (the "First Year Earnout"); and
>
> (c)     on the second anniversary of the Closing Date, Buyer shall pay to Seller an amount $2,027,198, subject to adjustment as set forth in subsection 1.04 below (the "Second Year Earnout" and, together with the First Year Earnout, the "Earnout Payments").

*Id.* § 1.03. (emphasis added.)

54.     In agreeing to the Purchase Price, Plaintiffs placed value on KRI's alleged intrinsic qualities – as represented by Defendant – including, but not limited to, its key personnel, workforce and financial performance.

55.     Staffing 360 signed onto the SPA "solely with respect to the specific provisions set forth on the signature page" which included certain of the payment obligations, and guaranteed the full and timely performance of Monroe's payment obligations under the SPA.  *Id.* at 1, § 1.05.

56.     However, the SPA expressly provided that Staffing 360 "shall be entitled to assert any and all rights, remedies and defenses which would otherwise be available to [Monroe] under

this Agreement." *Id.*, § 1.05(b).

**F.**     ***Defendant's Numerous Representations And Warranties To Plaintiffs Under the SPA.***

57.     Under Article III of the SPA ("Article III"), Defendant provided numerous representations and warranties to Plaintiffs.

58.     Defendant's representations and warranties to Plaintiffs under Article III of the SPA constitute statements of present fact.

59.     Indeed, Defendant expressly represented and warranted to Plaintiffs that each of the statements contained in Article III were "true and correct" as of the date of the SPA.  *See* Ex. A (SPA), Article III at p. 7.

60.     Further, pursuant to Section 3.22 of the SPA, Defendant expressly represented and warranted that she had provided Plaintiffs with "full disclosure" and that no representation or warranty set forth under the SPA, and no statement contained in the SPA's Disclosure Schedules or any certificate or other document furnished or to be furnished to Monroe pursuant to the SPA, contained any untrue statement of material fact or omitted  to state a material fact necessary to make statements contained in the SPA not misleading as follows:

> **Section 3.22 Full Disclosure.**  No representation or warranty by Seller in this Agreement and no statement contained in the Disclosure Schedules to this Agreement or any certificate or other document furnished or to be furnished to Buyer pursuant to this Agreement contains any untrue statement of material fact, or omits to state a material fact necessary to make the statements contained therein, in light of the circumstances in which they are made, not misleading.

*Id.*, § 3.22.

61.     The representations set forth under the SPA including, but not limited to, Article III, were material and vital to Plaintiffs' decision to execute the Agreement because numerous material facts that were critical to Monroe's decision to purchase KRI were peculiarly within the

knowledge of Defendant and not disclosed to Plaintiffs.

62.     Further, the representations and warranties set forth under Article III of the SPA represent contractual stipulations that the facts covered by such representations and warranties constitute information exclusively within Defendant's knowledge.

63.     Accordingly, the representations and warranties set forth under Article III of the SPA including, but certainly not limited to, the specific representations of "Full Disclosure" made under Section 3.22, imposed a duty on Defendant to provide accurate and adequate facts on which Plaintiffs were entitled to rely.

64.     Among the numerous representations and warranties that Defendant made to Plaintiffs under Article III of the SPA, was a representation that KRI had the full corporate power and authority to operate and carry on its business in the manner in which it was being conducted at the time of the SPA as follows:

> **Section 3.02   Organization, Authority, and Qualification of the Company.**  The Company is a corporation duly organized, validly existing, and in good standing under the Laws of the state of North Carolina, has been a validly electing and qualifying S-corporation within the meaning of Section 1361 and Section 1362 of the Code since January 1, 2004 and shall continue to be a valid S-corporation for federal, state and local Tax purposes up to and including the Closing Date, and has full corporate power and authority to own, operate, or lease the properties and assets now owned, operated, or leased by it and to carry on its business as it has been and is currently conducted.

*Id.*, § 3.02.

65.     Defendant further represented and warranted that KRI had "no liabilities, obligations, or commitments of any nature whatsoever, whether asserted, known, absolute, accrued, matured, or otherwise" as follows:

> **Section 3.07     Undisclosed Liabilities.** The Company has no liabilities, obligations, or commitments of any nature whatsoever, whether asserted, known, absolute, accrued, matured, or otherwise

> (collectively, "Liabilities"), except: (a) those which are adequately reflected or reserved against in the Balance Sheet as of the Balance Sheet Date; and (b) those which have been incurred in the ordinary course of business consistent with past practice since the Balance Sheet Date and which are not, individually or in the aggregate, material in amount.

*Id.*, § 3.07.

66.     Defendant also represented that no events had occurred following her provision of

KRI's balance sheet to Plaintiffs which could adversely impact KRI's business as follows:

> **Section 3.08     Absence of Certain Changes, Events, and Conditions.**
> Since the Balance Sheet Date, and other than in the ordinary course of business consistent with past practice, there has not been, with respect to the Company, any change, event, condition, or development that is, or could reasonably be expected to be, individually or in the aggregate, materially adverse to the business, results of operations, condition (financial or otherwise), prospects, or assets of the Company.

*Id.*, § 3.08.

67.     Defendant further represented that no events had occurred and no circumstances

existed that might give rise to, or serve as the basis for, *inter alia*, any actions, claims, inquiries,

audits, notices of violations, or investigations of any kind as follows:

> **Section 3.14   Legal Proceedings; Governmental Orders.**
>
> (a)     There are no claims, actions, causes of action, demands, lawsuits, arbitrations, inquiries, audits, notices of violation, proceedings, litigation, citations, summons, subpoenas, or investigations of any nature, whether at law or in equity (collectively, "Actions") pending or, to Seller's knowledge, threatened against or by the Company, Seller, or any Affiliate of Seller: (i) relating to or affecting the Company or any of the Company's properties or assets; or (ii) that challenge or seek to prevent, enjoin, or otherwise delay the transactions contemplated by this Agreement. To Seller's knowledge, no event has occurred or circumstances exist that may give rise to, or serve as a basis for, any such Action.

*Id.*, § 3.14(a).

68.     Defendant also represented that KRI had complied, and was complying, with all

laws applicable to its business as follows:

> ### Section 3.15   Compliance With Laws; Permits.
>
> (a)      The Company has complied, and is now complying, with all Laws applicable to it or its business, properties, or assets.
>
> (b)      All Permits in order for the Company to conduct its business, including, without limitation, owning or operating any of the Real Property, have been obtained and are valid and in full force and effect.  Section 3.15(b) of the Disclosure Schedules list all current Permits issued to the Company and no event has occurred that would reasonably be expected to result in the revocation or lapse of any such Permit.

*Id.*, § 3.15.

69.      Finally, pursuant to Section 3.18(c) of the SPA ("Section 3.18(c)"), Defendant expressly represented and warranted that KRI was in compliance with all laws relating to the employment of its employees, independent contractors and contingent workers as follows:

> ### Section 3.18   Employment Matters.
>
> (c) The Company is and has been in compliance with: (i) all applicable employment Laws and agreements regarding hiring, employment, termination of employment, plant closings and mass layoffs, employment discrimination, harassment, retaliation, and reasonable accommodation, leaves of absence, terms and conditions of employment, wages and hours of work, employee classification, employee health and safety, engagement and classification of independent contractors, payroll taxes, and immigration with respect to all employees, independent contractors, and contingent workers; and (ii) all applicable Laws relating to the relations between it and any labor organization, trade union, work council, or other body representing employees of the Company.

*Id.*, § 3.18(c).

70.      The representation and warranty set forth under Section 3.18(c) was of critical importance to Plaintiffs in deciding whether or not to execute the SPA and consummate the Purchase of KRI because KRI's primary asset was its workforce upon which KRI's success as a

business (or lack thereof) depended.

71.     Among other things, Plaintiffs believed they were purchasing Defendant's promise regarding the truth of the warranted and represented facts set forth under the SPA including, but not limited to, those identified and set forth at length herein.

**G.     *Unbeknownst to Plaintiffs, Defendant's Representations Were False.***

72.     Unbeknownst to Plaintiffs, at the time that Defendant made each of the foregoing representations she knowingly misrepresented the material facts stated and/or omitted material facts underlying those representations.

73.     Among other things, Defendant knowingly misrepresented that KRI was operating in compliance with all laws, rules and regulations governing the employment and/or retention of its workforce and that KRI was authorized to operate and carry on its business in the manner in which it was being conducted as of the date the SPA was executed.

74.     Defendant's misrepresentations were material because a "reasonable man" purchasing a staffing agency would attach importance to representations regarding whether the employees of the staffing agency—KRI's primary, if not only, asset—were legally eligible for employment by the staffing agency and/or in compliance with federal employment laws.

75.     As set forth more fully below, Defendant's misrepresentations included but are not limited to her knowing misrepresentations of the present facts denoted by the representations and warranties set forth by Sections 3.02, 3.07, 3.08, 3.14, 3.15, 3.18 and 3.22 of the SPA in so far each of the representations set forth in those Sections state that KRI was in compliance with various rules, regulations and laws governing numerous aspects of KRI's employment and/or retention of its workforce when, in fact, Defendant knew that was *not* the case.

76.     As the result of Defendant's various misrepresentations—individually and collectively—Defendant led Monroe to believe that the business it was purchasing under the

SPA was far more valuable than the business Monroe actually received.

77.     In actuality, the business Monroe received from Defendant as a result of the Purchase was decidedly inferior to the business Defendant represented to Plaintiffs that she was selling to Monroe.

78.     Plaintiffs justifiably relied on Defendant's numerous misrepresentations—including, but not limited to, the numerous misstatements and omissions of present facts set forth in Article III of the SPA—and executed the SPA, and Monroe promptly tendered the Closing Date Payment in the amount of $8,108,794 to Defendant.[1]

79.     Additionally, Defendant knew that, contrary to the representation in Article III that the representations and warranties set forth by, *inter alia*, Sections 3.02, 3.07, 3.08, 3.14, 3.15, 3.18 and 3.22 of the SPA were "true and correct" ***as of the date of the SPA***, the representations and warranties set forth in Sections 3.02, 3.07, 3.08, 3.14, 3.15, 3.18 and 3.22 of the SPA were, in fact, *not* "true and correct" on August 27, 2018—the date the SPA was executed.

80.     Accordingly, on August 27, 2018, Defendant was in material breach of the SPA.

**H.     *The Amendment.***

81.     On September 11, 2019, the Parties executed the Amendment pursuant to which, among other things, the deadline by which the First and Second Year Earn-out Payments needed to be paid in full was extended to and including February 27, 2020.  A true and correct copy of the Amendment is annexed hereto as **Exhibit B**.

82.     In accordance with the Amendment's terms, Monroe tendered interest on the First Year Earnout to Defendant in the amount of $10,000 per month—representing the agreed upon

---

[1]     Defined terms not defined herein should be given the meaning set forth under the Agreement.

interest rate on the First Year Earnout—for the months of September 2019, October 2019, November 2019, December 2019 and January 2020.

83. The Amendment includes a governing law and jurisdiction clause which makes clear that the "Governing Law; Submission to Jurisdiction" clause set forth under Section 8.08 of the SPA was "incorporated herein by reference and made a part hereof." Ex. B (Amendment), § 3.

84. The Amendment further provides that "[e]xcept as set forth herein, the Share Purchase Agreement shall remain in full force and effect." *Id*. § 4.

I. ***Plaintiffs Discover Indications of Defendant's Misrepresentations and Breaches of the SPA's Representations and Warranties.***

85. In or about September 2019, Plaintiffs prepared to conduct a routine audit of its operating units including, for the first time, KRI. However, Plaintiffs' audit quickly revealed that certain of the representations that Defendant made to them in connection with the Purchase and upon which Plaintiffs reasonably relied in executing the SPA and the Amendment may have been false.

86. Specifically, upon review of KRI's employee files, members of Staffing 360's senior management discovered that KRI's hiring and retention practices appeared to have violated various rules, laws and regulations because KRI neglected to fill out Form I-9s for numerous employees and, for those employees with Form I-9s, many of the Form I-9s were filled out improperly, missing required information, and/or missing supporting documentation. Moreover, numerous employees' Form I-9s and supporting documentation appeared inauthentic on their face, calling into question the validity of the documentation.

87. As specifically detailed herein, in many instances KRI's hiring practices under Defendant's leadership were so suspect as to call into question the ability of KRI's employees, independent contractors, and contingent workers to lawfully continue their employment with

Plaintiffs.

88.     Based on these findings, Plaintiffs' counsel wrote to Defendant on November 25, 2019 (the "Notice"), to put Defendant on notice that Plaintiffs had discovered that certain of the representations made to them in connection with the Purchase appeared to be false and that Plaintiffs were initiating an investigation into Defendant's potential fraud.

89.     While Plaintiffs were hopeful that their investigation would conclude without any findings of malfeasance, Plaintiffs reserved all rights to take any and all action necessary to preserve and/or assert their rights.

**J.      *Plaintiffs' Suspicions Are Confirmed.***

90.     Based on their suspicions, Plaintiffs conducted a review of KRI's hiring and retention practices and related documentation and files.  Specifically, Plaintiffs reviewed all of KRI's I-9 files for both current and former employees and KRI's employee confirmations in E-Verify, the federal government's online employment status verification system.

91.     As noted above, Form I-9s are used to verify the identity and employment authorization of individuals hired for employment in the United States. All U.S. employers must properly complete a Form I-9 for each individual they hire for employment in the United States. This includes citizens and noncitizens. Both employees and employers (or authorized representatives of the employer) must complete and sign the Form I-9.

92.     Specifically, on the Form I-9, an employee must attest to his or her employment authorization by representing—under penalty of perjury—that the employee is either: (i) a citizen of the United States, (ii) a noncitizen national of the United States, (iii) a lawful permanent resident, or (iv) an alien authorized to work.  Lawful permanent residents must also provide their alien registration number / USCIS number and aliens authorized to work must

provide the end date of their work authorization, as well as their alien registration number / USCIS number, a Form I-9 admission number or a foreign passport number.

93.     The employee must also present his or her employer with acceptable documents evidencing identity and employment authorization. The employer must examine the employment eligibility and identity document(s) an employee presents to determine whether the document(s) reasonably appear to be genuine and relate to the employee and record the document information on the Form I-9.

94.     E-Verify is a web-based system that allows enrolled employers to confirm the eligibility of their employees to work in the United States. E-Verify employers verify the identity and employment eligibility of newly hired employees by electronically matching information provided by employees on the Form I-9, Employment Eligibility Verification, against records available to the Social Security Administration (the "SSA") and the Department of Homeland Security (the "DHS").

95.     E-Verify is a voluntary program. However, employers may also be required to participate in E-Verify if their states have legislation mandating the use of E-Verify, such as a condition of business licensing. North Carolina, where KRI operates, *has* legislation mandating the use of E-Verify as a condition of business licensing. Moreover, in some instances employers may be required to participate in E-Verify as a result of a legal ruling.

96.     In 2012, KRI signed the standard Memorandum of Understanding ("MOU") with the DHS, thereby agreeing to participate in the federal government's E-Verify program. Pursuant to the MOU, KRI must, *inter alia*, complete a Form I-9 for each newly hired employee and then, within three business days of commencing employment, create an E-Verify case for that employee.

97.     In addition, KRI is subject to North Carolina's E-Verify Law, which requires KRI to create an E-Verify case for all non-seasonal employees hired on or after October 1, 2012, in order to verify its employees' work authorizations within three business days of each employee's date of hire. 13 NCAC 12 .0903(a).

98.     Once E-Verify checks the employee's information entered against records available to SSA and DHS, the following results are possible: (i) "Employment Authorized[,]" which means that the employee's information matched records available to SSA and/or DHS; (ii) "Verification in Process" which means that the case was referred to DHS for further verification; (iii) "Tentative Nonconfirmation" ("TNC"), which means that the information submitted in E-Verify did not match records available to SSA and/or DHS and that additional action is required; (iv) "Case in Continuance" which means that the employee has visited an SSA field office or contacted DHS, but more time is needed to determine a final case result; (v) "Close Case and Resubmit" which means that SSA or DHS requires that the employer close the case and create a new case for this employee (which may occur if the employee's U.S. passport, passport card, or driver's license information is incorrect); or (vi) "Final Nonconfirmation" ("FNC") which means that E-Verify cannot confirm the employee's employment eligibility after the employee visited SSA or contacted DHS.

99.     By late February 2020, it became clear that large percentages of the employment records provided and/or maintained by Defendant with respect to KRI's workforce and provided to Plaintiffs in connection with the Purchase were either missing or appeared suspicious.

100.     Specifically, Plaintiffs' review of KRI's employment records revealed that, among other things, KRI failed to: (i) create or maintain completed Forms I-9 for all employees as required by the IRCA; (ii) complete all required sections of the Forms I-9, for those

employees with Form I-9s; (iii) complete I-9 paperwork for employees within three days of hire,
as mandated by the IRCA; and (iv) complete Re-Verification Form I-9s for employees whose
work authorization expired during their employment, on or before the date the employment
authorization expired, as required by the IRCA.

101.    In fact, of the 1,987 KRI employee records—including Form I-9s—that were
reviewed, nearly 20 percent of the records were of questionable authenticity.  For example,
nearly 7% of the employee records examined contained incorrect versions of the permanent
resident cards (submitted with the Form I-9s) for the employee's alleged date of residency.
Furthermore, the ID documentation provided for more than 2% of employees indicated that the
ID was issued after 2003 by INS.  However, that could not be possible, because INS ceased to
exist in 2003. *See* Exhibit C.[2]

102.    Plaintiffs' review also revealed substantive and/or technical compliance issues
with 63% of the employee records reviewed.  For example, more than 39% of the employee
Form I-9s were missing required employee information from Section 1.  Section 1 requires that
employees provide their full legal name and other last names that they have used in the past or
present; their home address, apartment number, city or town, state and ZIP code; their date of
birth; an attestation to their citizenship or immigration status; and/or enter "N/A" in any field for
which no applicable information exists.[3]  Furthermore, nearly 6% of employee Form I-9s used

---

[2]    Attached hereto as **Exhibit C** is a chart detailing the technical, substantive and/or
authenticity issues with respect to specific employees' records discovered by Plaintiffs as a
result of their investigation.  In order to protect the identities of the employees, the names of
each employee have been replaced with employee reference numbers for the purposes of this
filing.  However, Plaintiffs will provide Defendant with the relevant employee names, as well
as all supporting documentation used to create Exhibit C, in discovery.

[3]    USCIS, HANDBOOK FOR EMPLOYERS M-274, Part 3.0 Completing Section 1 of Form I-
9 (last updated Nov. 24, 2020), https://www.uscis.gov/i-9-central/form-i-9-
resources/handbook-for-employers-m-274/handbook-for-employers-m-274.

versions of the Form I-9 that were no longer accepted by the USCIS due to the issuance of an updated version of the Form.  *See* Exhibit C.

103.    Furthermore, in violation of both North Carolina and federal E-Verify requirements, Defendant failed to confirm the eligibility of each of its employees to work in the United States through E-Verify and, instead, only selectively used E-Verify for certain employees.  Indeed, KRI did not create E-Verify cases for more than 400 employees.  *See* Exhibit D.[4]

104.    Defendant also improperly handled employees whose results in E-Verify were either a TNC or FNC.  If E-Verify displays a TNC case result, within 10 federal government working days, the employer must: (1) notify the employee of the TNC, by downloading the "Further Action Notice" from E-Verify and providing the employee with a copy of the Further Action Notice either in person, by fax, email, overnight or next-day delivery service; (2) instruct the employee to indicate whether he or she will take further action to resolve the TNC; (3) have the employee sign and date the Further Action Notice; and (4) attach the original signed Further Action Notice to the employee's Form I-9.

105.    Should the employee decline to take further action or if the employee notifies the employer that he or she will not take further action within 10 federal government working days, the employer must close the case in E-Verify.  Should the employee indicate to the employer that he or she will take action to resolve the TNC, the employer must confirm the employee's

---

[4]    Attached hereto as **Exhibit D** is a chart with descriptions of KRI's state and federal E-Verify violations that are representative, but not exhaustive, of those discovered by Plaintiffs as a result of their investigation.  In order to protect the identities of the employees for whom there were E-Verify violations, the names of each employee have been replaced with employee reference numbers for the purposes of this filing.  However, Plaintiffs will provide Defendant with the relevant employee names, as well as all supporting documentation used to create Exhibit D, in discovery.

decision in E-Verify and monitor E-Verify for case result updates (and then follow the required steps based on case result provided).

106.    However, Defendant failed to notify employees with a TNC of the TNC, provide the employees a copy of the Further Action Notice, or attach the original, signed Further Action Notice to the employee's Form I-9, as required.  Furthermore, Defendant continued to employ employees with TNCs, even if the employee took no further action to resolve the TNC.  *See* Exhibit D.

107.    Furthermore, if E-Verify displays a FNC case result, the employer must close the employee's E-Verify case and discontinue the employee's employment.  However, Plaintiffs' investigation revealed that Defendant failed to close the E-Verify cases of numerous employees with FNCs, and wrongfully continued to employ those employees.  *See* Exhibit D.

108.    Importantly—and perhaps most alarmingly—Plaintiffs' investigation, including interviews with many of Defendant's former employees at KRI, revealed that Defendant was well-aware of these issues surrounding the documentation of KRI's workforce both prior to and at the time she executed the SPA and the Amendment with Plaintiffs.

109.    Indeed, according to employees at KRI, Defendant encouraged the misconduct by directing her screening professionals never to turn away a potential contractor.

110.    Thus, contrary to Defendant's express representations during the course of the parties' negotiations—including, but not limited to, the in-person meeting held in Greensboro, North Carolina on May 9, 2018, and Defendant's telephone call with Staffing 360's Chairman and Chief Executive Officer, Brendan Flood, on July 18, 2018—KRI did *not* have "tight controls over all of [its] administrative activities" and did *not* "uphold the highest standards."

111.    Instead, as set forth herein, KRI's hiring practices violated various rules, laws and

regulation governing KRI's operations and/or employment of certain individuals.  Such

violations rendered the majority of KRI's employees, independent contractors and contingent

workers non-compliant with the requirements of the IRCA and, in some cases, legally *ineligible*

to lawfully continue their employment with KRI in accordance with the IRCA.

117. 112.    Defendant knew that her representations that KRI has "tight controls over all of

[its] administrative activities" and "uphold[s] the highest standards" were false when made.

113.    Plaintiffs' discovery of the numerous improprieties and deficiencies identified in

KRI's employment files confirmed that the workforce Defendant promised Plaintiffs that

Monroe would receive as a result of the Purchase—KRI's primary asset—was not the workforce

Monroe actually received.

114.    Rather, the legally eligible and compliant workforce that Monroe actually

received and was able to utilize as a result of the Purchase was substantially smaller than the

workforce Defendant led Monroe to believe it was purchasing when the Parties executed the

SPA.

115.    This discovery also meant that many of the warranties and representations set

forth in the SPA included material misstatements of present facts and/or omitted material facts.

116.    For example, in Section 3.02 of the SPA, Defendant represented that KRI has

"full corporate power and authority . . .  to carry on its business as it has been and is currently

conducted."  Ex. A (SPA), § 3.02.

117.    However, under the IRCA, KRI is required to properly complete a Form I-9 for

each new employee hired after November 6, 1986.  Failure to properly complete the Form I-9,

either with substantive or technical errors, can result in a Paperwork Violation under the IRCA.

INA § 274A(b).  The IRCA also recognizes Knowing Violations, which can occur if an

employer knowingly hires or continues to employ an individual who is unauthorized to work in the United States.  INA § 274A(a)(1)(A), (a)(2); 8 U.S.C. § 1324a(a)(1)(A), (a)(2).  Furthermore, if an employer regularly employs unauthorized workers and/or intentionally engages in a pattern or practice of violating the IRCA, then the employer can be subject to civil penalties, injunctive relief, and/or criminal penalties. INA § 274A(a)(1)(A), (a)(2); 8 U.S.C. § 1324a(a)(1)(A), (a)(2).

118.    Plaintiffs' investigation revealed that KRI failed to fulfill even the most basic requirements of the IRCA.  Not only did KRI fail to complete the Form I-9 for all its employees, but for those employees with a Form I-9, nearly 64 percent contained substantive and/or technical errors, such as: (i) failing to include copies of identification cards;[5] (ii) using expired visas; (iii) using outdated Form I-9s; (iv) incorrectly identifying the employee's name; and (v) omitting entire sections of the Form I-9.

119.    Upon information and belief, Defendant was well-aware of the defects in the documentation for KRI's workforce, yet Defendant continued to knowingly hire and employ individuals who were unauthorized and ineligible to work in the United States.  Thus, the manner in which KRI was carrying on its business subjected it to liability for both Paperwork and Knowing Violations under the IRCA.  *See* INA § 274A(b); INA § 274A(a)(1)(A), (a)(2); 8 U.S.C. § 1324a(a)(1)(A), (a)(2).

---

[5]    Employers who use E-Verify must retain copies of certain identity documents, including passports, permanent resident cards, and employment authorization documents.  USCIS, HANDBOOK FOR EMPLOYERS M-274, Part 9.2 Retaining Copies of Form I-9 Documents (last updated Nov. 24, 2020), https://www.uscis.gov/i-9-central/form-i-9-resources/handbook-for-employers-m-274/handbook-for-employers-m-274.  In all other cases, relevant federal policies require that employers either retain copies of identification documents provided by *all* employees or no copies at all.  *Id*. ("If you choose to retain copies of an employee's documents for reasons unrelated to E-Verify requirements, you must do so for all employees, regardless of actual or perceived national origin or citizenship status, or you may violate anti-discrimination laws.").  Defendant violated this requirement by retaining copies of identification documents for only certain employees.

120.     Furthermore, Defendant failed to comply with federal and state E-Verify requirements.  Indeed, Defendant only selectively created E-Verify cases for its employees, and, in some instances, failed to create cases within three business days of the employee's date of hire as required by the MOU and North Carolina's E-Verify Law.  13 NCAC 12 .0903(a).  Defendant also failed to notify employees with a TNC of the TNC, provide the employees a copy of the Further Action Notice, and attach the original, signed Further Action Notice to the employee's Form I-9, as required, and unlawfully continued to employ individuals with FNCs.  Thus, the manner in which KRI was carrying on its business subjected it to liability for violations of the MOU and North Carolina's E-Verify laws.

121.     Given these facts, Defendant breached the representation in Section 3.02 of the SPA, that KRI has "full corporate power and authority . . .  to carry on its business as it has been and is currently conducted[.]"  To the contrary, KRI did not have the "full corporate power and authority . . . to carry on its business" absent properly completed Form I-9s for each of its employees, independent contractors and contingent workers or otherwise in violation of the IRCA. Nor did KRI have the "full corporate power and authority . . . to carry on its business" absent strict compliance with federal and state E-Verify requirements. Yet, that was precisely how KRI was carrying on its business.

122.     Moreover, at the time Defendant made the representation set forth under Section 3.02 of the SPA, she knew that KRI had not properly completed Form I-9s for each of its employees, independent contractors and contingent workers and was therefore operating in violation of, *inter alia*, the IRCA.  Defendant also knew that KRI had not complied with federal and state E-Verify requirements. Accordingly, Defendant knew that the representation she made in Section 3.02 of the SPA—by which she represented that KRI had "full corporate power and

authority . . . to carry on its business as it has been and is currently conducted" was false, and that it continued to be false as of August 27, 2018—the date the Parties executed the SPA.

123.    Similarly, upon information and belief, Defendant also knowingly misrepresented the statements of fact included as part of the representations set forth under Sections 3.07 and 3.08 of the SPA.

124.    Specifically, Defendant represented in Section 3.07 that "[t]he Company has no liabilities, obligations, or commitments of any nature whatsoever, whether asserted, known, absolute, accrued, matured, or otherwise (collectively, "Liabilities"), except: (a) those which are adequately reflected or reserved against in the Balance Sheet . . ." provided to Plaintiffs.  Ex. A (SPA), § 3.07.

125.    Furthermore, Defendant represented in Section 3.08 that "there has not been, with respect to the Company, any change, event, condition, or development that is, or could reasonably be expected to be, individually or in the aggregate, materially adverse to the business, results of operations, condition (financial or otherwise), prospects, or assets of the Company" since date of such Balance Sheet. *Id.* § 3.08.

126.    Importantly, the Balance Sheet provided to Plaintiffs did not reflect or reserve against *any* liabilities to KRI—either before or after the date of the Balance Sheet—for violations of state or federal law, or litigation, investigations or other claims related thereto.

127.    However, both Paperwork and Knowing Violations of the IRCA are punishable with civil penalties.  For example, the first offense penalty for knowingly employing unauthorized individuals is "not less than $275 and not more than $2,200 for each unauthorized alien with respect to whom the offense occurred before March 27, 2008; not less than $375 and not exceeding $3,200, for each unauthorized alien with respect to whom the offense occurred

occurring on or after March 27, 2008 and on or before November 2, 2015; and not less than $583 and not more than $4,667 for each unauthorized alien with respect to whom the offense occurred occurring after November 2, 2015. . . ."  8 C.F.R. § 274a.10(b)(1)(ii).  Furthermore, unresolved Paperwork Violations after November 2, 2015 can incur a civil penalty in an amount of "not less than $234 and not more than $2,332" for each individual whose paperwork contained a violation. 8 C.F.R. § 274a.10(b)(2).  For any violations occurring before November 2, 2015, the penalty is "not less than $110 and not more than $1,100" per individual.  *Id.*

128.    Failure to comply with the MOU and/or North Carolina's E-Verify laws also subjected KRI to financial liability.  Indeed, by continuing to employ employees who received a FNC, KRI could be subject to a civil money penalty between $550 and $1,100 *per* employee, pursuant to the MOU.  KRI's selective use of E-Verify could also draw employment discrimination claims (in the form of both private litigation and government enforcement actions).

129.    Thus, Defendant's representation in Section 3.07 that "[t]he Company has no liabilities, obligations, or commitments *of any nature whatsoever*" except as "reflected or reserved against in the Balance Sheet" provided to Plaintiffs was false because KRI's business practices—both prior to and on the date of the Balance Sheet—violated the IRCA and state and federal E-Verify rules and exposed KRI to *hundreds of thousands* of dollars in liability (if not, more), *none* of which was "reflected or reserved against in the Balance Sheet."

130.    Furthermore, at the time Defendant made such a representation, she knew that the Balance Sheet did not "reflect or reserve against" any violations of the IRCA or state and federal E-Verify rules, and that KRI's business practices exposed KRI to *hundreds of thousands* of dollars in liability (if not, more) for such violations.  Defendant also knew that representation

continued to be false as of August 27, 2018—the date the Parties executed the SPA.

131.    Similarly, Defendant's representation in Section 3.08 that "there has not been, with respect to the Company, any change, event, condition, or development that is, or could reasonably be expected to be, individually or in the aggregate, materially adverse to the business, results of operations, condition (financial or otherwise), prospects, or assets of the Company" since the date of the Balance Sheet was also false.

132.    In fact, upon information and belief, KRI's business practices continued to violate the IRCA and state and federal E-Verify rules following the date of the Balance Sheet in precisely the same manner as described above.  As a result, KRI was exposed to hundreds of thousands of dollars in liability (if not, more).  Such liability could "reasonably be expected to be . . . materially adverse to the business," as well as to its condition, prospects and/or assets, and was never disclosed to Plaintiffs.

133.    And at the time Defendant made such a representation, she also knew that there had been a "change, event, condition, or development that is, or could reasonably be expected to be, individually or in the aggregate, materially adverse to the business" since the date of the Balance Sheet, and further knew that such representation was false as of August 27, 2018—the date the Parties executed the SPA.

134.    The discovery of the improprieties with respect to KRI's employment records and/or documentation also confirmed that the statements of fact made by Defendant under Sections 3.14, 3.15, and 3.18 were false.

135.    In Section 3.14, Defendant specifically represented that "[t]o Seller's knowledge, no event has occurred or circumstances exist that may give rise to, or serve as a basis for" any "claims, actions, causes of action, demands, lawsuits, arbitrations, inquiries, audits, notices of

violation, proceedings, litigation, citations, summons, subpoenas, or investigations of any nature"
against KRI, Defendant or any affiliate of Defendant.  Ex. A (SPA), § 3.14.

136.   Relatedly, in Section 3.15, Defendant represented that KRI "has complied, and is
now complying, with all Laws applicable to it or its business, properties, or assets."  *Id.* § 3.15.

137.   Furthermore, in Section 3.18 Defendant represented that "[t]he Company is and
has been in compliance with: (i) all applicable employment Laws and agreements regarding
hiring, employment, termination of employment . . . employment discrimination . . . payroll
taxes, and immigration with respect to all employees, independent contractors, and contingent
workers."  *Id.* § 3.18.

138.   The IRCA and North Carolina's E-Verify laws constitute employment "Laws
applicable to [KRI] or [KRI's business, properties, or assets" and concern, among other things,
hiring, employment and immigration.  Similarly, the MOU constitutes an employment agreement
which concerns, among other things, hiring, employment and immigration.

139.   However, KRI's business practices—both prior to and at the time of the Parties'
execution of the SPA—violated those laws and the MOU.

140.   For example, KRI failed to properly complete the Form I-9 for all its employees,
by, *inter alia*: (i) failing to include copies of identification cards for at least 25 of its employees;
(ii) failing to include required employee information in Section 1 of the Form I-9 for at least
1,101 employees; (iii) using versions of the Form I-9 no longer accepted by USCIS due to the
issuance of an updated version for at least 116 of its employees; (iv) incorrectly identifying the
employee's name for at least 60 of its employees; and (v) failing to maintain employee
identification documents for at least 23 of its employees, all of which constitute Paperwork
Violations of the IRCA.  *See* INA § 274A(b).  Moreover, KRI failed to complete any Form I-9

for certain employees, *at all*, in clear contravention of the IRCA.  *See* Exhibit C.

141.    Upon information and belief, Defendant not only knew of this misconduct, she also encouraged it.  And knowingly hiring and/or continuing to employ individuals unauthorized to work in the United States is a Knowing Violation of the IRCA.  *See* INA § 274A(a)(1)(A), (a)(2); 8 U.S.C. § 1324a(a)(1)(A) and (a)(2).

142.    Furthermore, Defendant's selective use of E-Verify for certain employees, failure to discontinue employment of FNC individuals, and failure to provide requisite notice to TNC individuals—among other things—violates North Carolina E-Verify laws and the MOU expressly agreed to by KRI.  *See* 13 NCAC 12 .0903(a).

143.    Thus, Defendant's representation in Section 3.15 that KRI "has complied, and is now complying, with all Laws applicable to it or its business, properties, or assets" was patently false because KRI failed to comply with, at least, the IRCA and North Carolina's E-Verify laws, which are directly applicable to KRI's business and workforce—its primary asset.

144.    Defendant knew, at the time such representation was made, that KRI had failed to comply with "all Laws applicable to it or its business, properties, or assets" and further knew that representation continued to be false as of August 27, 2018—the date the Parties executed the SPA.

145.    Similarly, Defendant's representation in Section 3.18 that "[t]he Company is and has been in compliance with: (i) all applicable employment Laws and agreements regarding hiring, employment, termination of employment . . . employment discrimination . . . payroll taxes, and immigration with respect to all employees, independent contractors, and contingent workers" was also false because KRI failed to comply with, at least, the IRCA and state and federal E-Verify rules, which are employment laws and/or agreements regarding, *inter alia*, hiring, employment and immigration.

146.     Defendant knew, at the time such representation was made, that KRI had failed to comply with comply with, at least, the IRCA and state and federal E-Verify rules, which are employment laws and/or agreements regarding, *inter alia*, hiring, employment and immigration and further knew that representation continued to be false as of August 27, 2018—the date the Parties executed the SPA.

147.     Furthermore, Defendant's representation in Section 3.14 that "[t]o Seller's knowledge, no event has occurred or circumstances exist that may give rise to, or serve as a basis for" any "claims, actions, causes of action, demands, lawsuits, arbitrations, inquiries, audits, notices of violation, proceedings, litigation, citations, summons, subpoenas, or investigations of any nature" against KRI, Defendant or any affiliate of Defendant was false, because Defendant plainly knew that KRI failed to comply with the IRCA and state and federal E-Verify rules— both prior to and at the time of the Parties' execution of the SPA—and there can be no question that such failures "may give rise to, or serve as a basis for" certain "claims, actions, causes of action, demands, lawsuits, arbitrations, inquiries, audits, notices of violation, proceedings, litigation, citations, summons, subpoenas, or investigations of any nature" with respect to KRI.

148.     Defendant also knew, at the time the representations in Section 3.14 of the SPA were made, that KRI had failed to comply with the IRCA and state and federal E-Verify rules, and there can be no question that such failures "may give rise to, or serve as a basis for" certain "claims, actions, causes of action, demands, lawsuits, arbitrations, inquiries, audits, notices of violation, proceedings, litigation, citations, summons, subpoenas, or investigations of any nature" with respect to KRI, and further knew that representation continued to be false as of August 27, 2018—the date the Parties executed the SPA.

149.     Finally, Defendant also knowingly misrepresented the statements of fact included

as part of the representations set forth under Sections 3.22 of the SPA.

150.    In Section 3.22, Defendant represented that no representation or warranty in the SPA "contains any untrue statement of material fact, or omits to state a material fact necessary to make the statements contained therein, in light of the circumstances in which they are made, not misleading."  Ex. A (SPA), § 3.22.

151.    However, as set forth above, the representations and warranties contained in, *at least*, Sections 3.02, 3.07, 3.08, 3.14, 3.15 and 3.18 were—both prior to and at the time of the Parties' execution of the SPA—"untrue statement[s] of material fact."  Thus, Defendant's representation in Section 3.22 that none of the representations and warranties in the SPA "contain[] any untrue statement of material fact" was demonstrably false.

152.    Defendant knew, at the time each statement was made, that the representations and warranties in, at least, Sections 3.02, 3.07, 3.08, 3.14, 3.15 and 3.18 of the SPA were false and further knew such representations and warranties continued to be false as of August 27, 2018—the date the Parties executed the SPA.

**K.     *Plaintiffs Notify Defendant of Her Material Breaches of the Agreement, Failure to Substantially Perform, and Related Misconduct Necessitating This Action.***

153.    On February 26, 2020, Plaintiffs wrote to Defendant advising her that the suspicions set forth in Plaintiffs' November 25 Notice were confirmed and that they were electing to exercise their rights to terminate the Agreement and sue for breach of the Agreement and fraudulent inducement (the "February 26 Letter").

154.    As of the time Plaintiffs elected to terminate the Agreement, Plaintiffs had fully performed all of their obligations under the Agreement by, *inter alia*, making the Closing Date Payment and, in accordance with the Amendment's terms, tendering interest to Defendant on the First Year Earnout in the amount of $10,000 per month for the months of September 2019,

October 2019, November 2019, December 2019 and January 2020.[6]

## FIRST CAUSE OF ACTION
### (Breach of Contract)

155.     Plaintiffs repeat and reallege the allegations contained in paragraphs 1 through 154 of this Complaint as if fully set forth herein.

156.     As described above, the Agreement constitutes a valid and legally binding contract between Plaintiffs and Defendant.

157.     Plaintiffs fully performed their obligations under the Agreement through February 26, 2020 by, among other things, making full payment of all amounts due to Defendant under the terms of the SPA up to (and beyond) the date Plaintiffs terminated the SPA on February 26, 2020.

158.     Despite Plaintiffs' performance of their obligations under the Agreement, Defendant materially breached her obligations under the Agreement by, among other things, breaching the representations and warranties set forth under Sections 3.02, 3.07, 3.08, 3.14, 3.15, 3.18 and 3.22 of the SPA as detailed herein.

159.     The effect of Defendant's breaches was material.

160.     Accordingly, Defendant failed to substantially perform her obligations under the Agreement.

161.     As a result of Whitaker's various material breaches of the Agreement and failure to substantially perform her obligations under the Agreement, Plaintiffs have been damaged in an amount to be determined at trial, but believed to be no less than $6 million, plus interest from the date of breach.

---

[6]     Furthermore, Plaintiffs inadvertently continued to make interest payments—beyond those required under the SPA—for the months of February 2020 and March 2020.

**WHEREFORE**, Plaintiffs demand that judgment be entered in their favor against Defendant as follows:

(i)     awarding Plaintiffs damages in an amount to be determined at trial but believed to be no less than $6 million, plus an award of interest;

(ii)    awarding Plaintiffs the costs, fees and expenses incurred in this action, including without limitation, reasonable attorneys' fees to the extent permitted by law; and

(iii)   awarding Plaintiffs such other and further relief as the Court may deem just and proper.

Dated:   March 12, 2021

> HAYNES AND BOONE, LLP
> *Attorneys for Plaintiffs*
>
>
> By: _/s/ Jonathan D. Pressment_
>     Jonathan D. Pressment
>     Abbey Gauger
>     30 Rockefeller Plaza
>     26th Floor
>     New York, New York 10112
>     Telephone: (212) 659-7300
>     Facsimile: (212) 918-8989
>     Jonathan.Pressment@haynesboone.com